Good afternoon. We have only one set of cases this afternoon for oral argument, and I want to express my appreciation to counsel for their gracious willingness to alter the schedule on short notice for reasons that none of us could change. The cases for argument that are consolidated are Berry, Mortimer, and Hart v. Antonovich. I'm not sure if I pronounced any of that correctly, but at all events, counsel may proceed when ready. STEPHEN YAGMAN Good afternoon, Judge Graber, Judge Nelson, Judge Gibson. My name is Stephen Yagman. I represent the plaintiffs in all of these cases. I don't know what to say to add to the briefs. JUDGE GRABER Well, let me ask you a question then. What specifically is different about the pleadings in this case than about the pleadings in Brass? STEPHEN YAGMAN I've never looked at the pleadings in Brass. It's not my case. I did file an amicus brief in support of a petition for re-hearing on Bonken Brass, but what happened in that case was that after both sides gave me permission to file the amicus, the plaintiffs in that case who had gotten an extension of time to file the petition for re-hearing on Bonnock blew the deadline, and when they filed it late, it was never heard. JUDGE GRABER Is this the same policy or a different policy? STEPHEN YAGMAN Oh, it's a different policy, or else we'd be out of it. JUDGE GRABER What's different about it? STEPHEN YAGMAN Reading the Brass opinion and the policy that was discussed there, what has changed? Because we're dealing with the same location and the same people. STEPHEN YAGMAN We're not dealing with the same policy. Brass had but one claim, and Brass's claim was because a court ordered me, Mr. Brass, to be released, I should have been put at the head of the line of people who were going to be released. That's the only issue the Brass court dealt with. I came in as an amicus in that case for re-hearing on Bonnock because I was concerned... JUDGE GRABER Well, I'm not worried about what your role was as amicus there. We're only dealing with what's here. STEPHEN YAGMAN I was concerned that subsequent future plaintiffs would end up in the pickle that my clients are in now, that their cases would be thrown out because a judge would say based on Brass, a broad reading of Brass, you can't challenge the overall release policy. So my position here is the overall release policy was not the policy or custom that was addressed in Brass. JUDGE GRABER What is the policy or custom that you allege is unconstitutional in this  STEPHEN YAGMAN I'm simply releasing people when they get good and ready to release people. The custom of just doing it in a sluggish, laggardly way and basically saying whenever we release them, it's okay. JUDGE GRABER How does that square? In Brass, the release time was 39 hours approximately and the court upheld that and said that in view of the fact that a lot of people go through the system and much of that evidence is the same here about how many people go through the system, that processing is required and 39 hours is permissible. These plaintiffs were released in about 29 hours or less. So I guess I'm not sure what's different about their situation that would make 29 hours unlawful where 39 hours was lawful. STEPHEN YAGMAN The Ninth Circuit, I understand, held in Brass that in the circumstances of that case that had but two circumstances, one, the release time, and two, that Brass claimed he should have been put at the head of the line to get out, that in the circumstances of that situation, there was nothing wrong with the policy and the only policy in that case was I want to get out before everybody else. JUDGE GRABER Where in Brass do you get the language that he wanted to be put at the head of the line? STEPHEN YAGMAN It's actually in the opinion. I don't have it. JUDGE GRABER I've got it in front of me and I've read it a couple of times and frankly, I don't see that language in it. I see the language. Brass challenges the order in which releases are processed. What Brass is raising is an issue of priority. STEPHEN YAGMAN Yes. JUDGE GRABER And that's on, well, I can't see what page that's on in Brass, but, well, it's on page 1199 and 1200. STEPHEN YAGMAN Judge Gibson, that's what I'm referring to. JUDGE GRABER But that's a little, what you're saying, put me at the head of the line, is very carefully selected. STEPHEN YAGMAN I don't think it's different for the reason that Brass contended that those persons who had been ordered released by a judge should get out first. That's where, that's why I'm saying it's put me at the head of the line. The order. The order, he claimed, of lumping everyone together and not differentiating among court-ordered releases and anybody else who was going to get out, is why I'm saying that what that boils down to, the order says, put me at the front of the queue. That's the only question. JUDGE GRABER Well, it isn't the only question, and that's why I keep coming back to the time, because it seems to me that, at a minimum, the Court held two things in Brass. One is that the policy, however you wish to word it, of processing everyone for a given day, all at once, was lawful, and that when that resulted in a delay of 39 hours, that too was lawful, because it takes time to process people. That's a, I mean, necessarily, the Court held that 39 hours wasn't unlawful. STEPHEN YAGMAN Under the circumstances and facts of that case, it's my job here to... JUDGE GRABER But what facts are different here? They're still processing people in a way, and it's taking less time now than it did then, so I guess I'm having a hard time seeing how that helps you. STEPHEN YAGMAN I think it should help us, because in Brass, this Court also said, also held, that to the extent, and this is, I'll put in the quotation marks when I get to the part from this Court... JUDGE GRABER What page are you reading from? STEPHEN YAGMAN I'm reading from something not in our brief. JUDGE GRABER But you're reading from Brass? STEPHEN YAGMAN But I'll tell you when I get...  STEPHEN YAGMAN I only have the Westlaw citation here, but let me just read it, and then I'll tell you where it comes from. To the extent that this Court already has held that, quote, here's the part that comes from Brass, in the circumstances of the reasonableness of the delay, brackets, in release, that issue was for the jury to determine. That's at 328 F. 2nd, 1192. I didn't have the pinpoint citation at the time I wrote what I wrote, and then it cites the case of Lewis v. O'Grady, which is a Seventh Circuit case that's at 853 F. 2nd, 1366, at pages 1367 through 70. I think that Brass stands for the proposition that the determination of reasonableness in release time or not is to be evaluated on a case-by-case basis. GINSBURG Let's assume you're correct on that. This was summary judgment, was it not? STEPHEN YAGMAN Yes. GINSBURG All right. What evidence did you submit to create a genuine issue of material fact with regard to the reasonableness of the county's policy? STEPHEN YAGMAN There were no disputes as to the times of detention, which ranged from one person for 26 hours and some minutes to two others for 29 hours and some minutes. GINSBURG So you're relying on length of detention only. STEPHEN YAGMAN I'm relying on length of detention and the way that the system functions, not the way that the system functions with respect to the order in which people were released, but the way the system functions in toto. And it's my reading of Brass that that decision did not affirm the system in toto, but simply affirmed that part of the system that refused to change the order of release. GINSBURG I understand that you're saying Brass is about order. That's not what you're about. STEPHEN YAGMAN And in the last paragraph of Brass, there is a statement from this Court that the decision, that this position is basically limited to the facts of that  case. The county submitted evidence, in particular the declarations of Patricia Jones and Charles Jackson, to support the fact that the county's administrative policies and processes regarding prison release are reasonable. But there is no evidence from the plaintiffs to demonstrate that the policies were being implemented in an unreasonably efficient manner. I don't believe that the plaintiffs had to submit such evidence at all. They're simply saying that. They're not expert witnesses. They're simply saying we think it's reasonable. Doesn't take that issue away from a jury. I mean, I could put in a declaration from somebody saying, hey, I think that's unreasonable. I don't think that takes it away from a jury. Each case has to be judged on its own circumstances. And what would have to be shown in this case is that what happened here was unreasonable. I think that an overdetention of 26 hours when a judge orders someone released is per se unreasonable. PATRICIA JONES I think the whole thing is an overdetention. I mean, what you just said is that a person must be released at the instant that the court orders it, because the whole thing was 26 hours for one person. STEPHEN YAGMAN I do believe that a person should be released when a judge says that. And, in fact, in another case that was before this court called Vanki, V-A-N-K-E versus Block, in that case, we got a preliminary injunction from the district court from the same judges in this case, Judge Dean Pregerson, who ordered that they do that and people be released from court. And now they are as a result of that case, because the county claimed it brought its policy into compliance with the me. This is over now. If a judge orders you released, you can leave the courtroom. They give you some kind of temporary jumpsuit, and you can go back to the jail and get your stuff. So this situation doesn't exist anymore. We put an end to that. And these are some cases that are kind of grandfathered, isn't the right word. These are from the old regime that existed before the Vanki case. Well, I still have difficulty that you're saying this case or this set of cases affect only a few people at this point, which is one way to look at it. But I guess and certainly it's better to have people released instantly than have them wait for a period of time. But I don't understand what's different about the circumstances, quote unquote, here than in Brass where 39 hours was not unconstitutional. Maybe not optimal, but not unconstitutional to have a processing of people. If processing of people per se were a violation, then Brass could not have come out the way it came out. I don't contend that processing people is a violation per se or any other way. I contend that it's an issue of fact for a jury to decide, given the circumstances of any particular release, that is, what was going on on that day, how many people were released, and that's evidence the other side would have to put on, was it reasonable or unreasonable in this case? I'd like to reserve the three minutes I have left, if I might. Thank you. Good afternoon, Your Honors. I'm Michael Allen with Mancel Strip and Robertson Lawrence, counsel for the defendant, Anna Kelly. And may it please the Court. Would you please speak up? I'm sorry, Your Honor. I think most of the arguments have been covered in the papers. Well, then let me ask you a question. Is there any way for us to affirm the District Court without creating a circuit split with the Seventh Circuit in Lewis v. O'Grady, which held what is a reasonable time for detaining a prisoner in custody is a question best left open for juries to answer based on the facts presented in each case? Your Honor, I don't know whether Lewis v. O'Grady expressly said that that is always an issue for the jury. The language correct, I mean, correct me if I'm wrong, I mean, I acknowledge that the Court there, that language suggests that it is best left for the jury. I don't know whether that was dictum or a holding, Lewis v. O'Grady. Let's assume it was a holding. But if it was a holding, I would have to say that there probably would be a circuit split because looking at Brass, Brass implicitly recognized that the Court itself could, under certain circumstances, decide as a matter of law that a delay is reasonable. So certainly if, in fact, Lewis v. O'Grady did hold that it is a jury question, I don't think there's any way around it to say that there would be a split. Well, Mr. Yagman makes strong arguments here. And one thing I see in Brass, and it's in the very last paragraph of the opinion, is the statement, one might conclude that when a court orders a prisoner released or when, for example, a prisoner's sentence has been completed, the outer bounds for releasing the prisoner should be less than 48 hours. Now, it seems to me that that language may be language that is certainly drawing a factual distinction, and it may be that these three plaintiffs' claims fall within that. And then he says we need not determine that question, however, because 39 hours is reasonable. But I'm wondering if that isn't an opening through which these three plaintiffs can come. Well, Judge Gibson, I'm glad you brought that issue up because, in fact, I was actually going to elaborate on that aspect of the Brass decision up front. In Brass, the argument before this Court was using an analogy to the McLaughlin v. County of Riverside case, which held that up to 48 hours to make a probable cause determination following a warrantless arrest is reasonable, using an analogy to the release process, should an outer bound 48-hour sealing be held presumptively reasonable. This Court in Brass said, well, without rejecting the notion that up to 48 hours could potentially be presumptively reasonable, decided that it didn't need to reach that decision because in Brass it was a 39-hour delay. This case, this Court's actually in an even better position because we're not even talking about 39 hours because we're talking about 26, 29, depending on the particular case. Arguably, if this case involved 42 hours, 43 hours, which would have been more than Brass but then less than that 48-hour sealing, then I think it would be a tough question. I think the Court would then have to reexamine the procedures and say, well, you know, is it something that could be done, should we set the sealing at 39 at least for the County of Los Angeles, or should we allow it to be up to 48? And I think when I look at the Brass decision, and I recognize that Brass said in these circumstances we find that 39 hours was reasonable as a matter of law, I read the decision and I recognize that. I think this Court in Brass recognized the possibility that there would be future litigation involving alleged overdetentions by smaller jails. I mean, pick a smaller county. What in Brass do you rely on to say that Los Angeles is now, you know, King's X, you can't sue us anymore? How do you read it to foreclose that, and why can't the circumstances be that people played pinnacle instead of letting him go? I think if a plaintiff comes forward with evidence that says, look, this was a slow day, you shouldn't have up to that 39 hours. If there's evidence suggesting that the case was different than Brass, I agree, Your Honor, then maybe the 39 hours shouldn't set a ceiling. So opposing counsel's position is that the mere existence of delay beyond a minimal delay is evidence that suggests that there could be a Fourth Amendment violation. What's wrong with that? I think the problem with the argument that plaintiff brought forward in this case is simply saying that the circumstances of Brass are different than this case. And let me close with one question. As I understand part of opposing counsel's argument, it is that we have brought forth facts to survive summary judgment because we have established the length of detention beyond the release time that was ordered. And that alone, because it is more than de minimis, it is significant, establishes that there could be a violation in the absence of a particularized explanation as to that individual. So I guess why isn't the length more than 24 hours or more than some minimal period enough to create an issue of fact? My response to that, Judge Graber, is that when Brass decided that 39 hours was reasonable as a matter of law, the factors that Brass cited, and I'm referring to page 1199 of the Brass decision, looked at the jail, handled an average of more than 200,000 inmates annually, booked and released close to 600 inmates per day, on an average received 3,000 to 5,000 documents daily. And all those factors which were evidenced before the Court in these cases is the same. So the real question is whether that was a holding as a matter of law or a holding as a matter of fact that has to be reproved in every case. I think that if these cases and Brass, it's like comparing apples to apples, oranges to oranges. We're talking about the same difficulties. The L.A. County Jail, we're comparing the L.A. County Jail system to the L.A. County Jail system. If this case, my point earlier when I was talking about the Mendocino County Jail or the Humboldt County Jail, which may only have to release a handful of inmates a day, if the issue in that case came up where the 24, 29-hour, 39-hour delay and the defendant in that case tried to rely on Brass, the Court might say, well, look, the circumstances in Brass involved a department that faced a humongous load of paperwork each day, had to release a huge number of inmates each day, had to send thousands of inmates back and forth to the courts each day. How could Mendocino County or Humboldt County or any smaller county in the Ninth Circuit make the same argument? I think, I mean, the issue in this case is we're comparing, I can't stress enough that we're comparing apples to apples. I mean, it's the same system. In fact, the release procedures that were in effect in these three cases were actually more improved and refined than those in Brass. As we pointed out in our papers, there was one procedure, which is the precise procedure that plaintiffs in these cases alleged unreasonably delayed the release. That procedure was abolished prior to these plaintiffs' releases. That procedure was still in effect at the time of the Brass release, which in fact, which effectively delayed his release by an additional 12 hours. But once that procedure was abolished, releases were quicker at the time of these plaintiffs' releases. So how could the county be penalized for improving its release process? I mean, I think that's the core of this case. We're talking about an improved release process. I think the facts are better in this case than Brass. The other aspect of this case specifically was the batching process or the order of release, that people who were ordered released at 11 and people who were ordered released at 2 were batched together and all dealt with at one time. And that that aspect is not what he's arguing about here. What's your response to that? I think that is a complete mischaracterization of the scope of the Brass decision. Page 1198 of Brass says, and I'm quoting, I'm reading from the Brass decision, he also appears to challenge the county's practice of not beginning the processing of releases until all information relating to the prisoners scheduled for release on a particular day has been received and entered into the computer system. Most of the discussion that follows, although framed in terms of his main contention, also covers the secondary argument. So the court in Brass, this court in Brass addressed two arguments. It says right there in black and white that it was also addressing the second contention, which is exactly the contention that was raised in the complaint in this case, which is in the excerpts of record, pages 4 and 5 of all three sets of excerpts. That was the policy that was being challenged in this case, which goes all the way back to Fowler and Vanke, which was discussed in our papers. And, I mean, I can go into discussing the name. So if I understand your argument correctly, it is that the policy itself was approved in Brass, so how could following the approved policy result in a violation? That's one of our... There's no evidence that the policy was not followed. The evidence is that the policy was abandoned prior to each of these three plaintiffs' releases. But even if it hadn't been abandoned, based on the Brass decision, that would not have been unreasonable to have that additional 12-hour delay. But we don't even... This court doesn't have to reach that issue because that additional procedure that was at issue in Brass had been abolished prior to this case, and there's no other procedure that's been identified by any of the plaintiffs that were in effect during Brass are not now in effect. I thought your argument was because the same procedures are in effect that Brass decides this case. The argument was all of the same procedures that were in effect in Brass are in effect with the exception of that one additional procedure that resulted in additional delays of usually up to 12 hours. And that's why the Brass case involved a 10- to 12-hour extended delay as opposed to these three plaintiffs. Otherwise, the entire release process is identical. You still have to identify each of the inmates, you still have to transport them to and from the 42 courts throughout the county, you still have to process 3,000 to 5,000 pieces of paperwork. And I think understanding what that procedure was in Brass, and understanding what the procedure was at this time, maybe will clarify why there's still some delays. If I could have a couple minutes, I could explain that. Isn't the fact that Brass involved a general bureaucratic policy that all the papers had to be in before they got to him, and this was a matter of policy and that's what's contested, isn't that a different situation than where we have a judge's order that this individual be released, and isn't that what that last paragraph, that middle sentence in the last paragraph is pointing to? And then, of course, you've got the Seventh Circuit case that settled an 11-hour delay where it was determined that it was the wrong person was too long, or it was a jury question anyway. I mean, aren't we really talking about a substantial difference between what really was going on in Brass and what their arguments were? I don't think so. I mean, if I could explain what the Brass procedure was and what the procedure was at this time, maybe it would be clarified. At the time of Brass, what happened was all the different pieces of paperwork would come in to the inmate reception center of the jail, but the paperwork wasn't processed until the last bag of paperwork came in from the last court. So, for example, if there was a hearings in Long Beach and the paperwork didn't come into the jail, the last bag, let's say 8 o'clock p.m., taking into account traffic, getting inmates on the bus, at that point when the last bag of paperwork came in, at that point the clerks at IRC would start processing the paperwork. What happened was if a piece of paperwork had come in earlier in the day, let's say 9 o'clock a.m., it would be sitting there in a room not being processed until the last bag of paperwork came in. So, as a result, there was a delay, maybe up to 12 hours. Now, after the situation in these three cases was that the paperwork was processed as soon as it got back to IRC, and the reason why the procedure was different prior in the Brass time was this. Typically, you'd have an inmate go to court. He might get an order authorizing his release on that particular case. If he was processed out immediately based on that piece of paperwork as soon as it came into the jail, it was conceivable that another piece of paperwork would come in from another court two hours later saying, we've got a warrant to hold him on another case. Well, if he was already released, he'd have to be rearrested. So for that reason, the county jail at that time used to wait until the end of the day, process all the paperwork, and at that point in time, there was nothing showing, there were no holds, wants, or warrants. At that point, they'd release the inmate. Now, at least at the time of these three plaintiffs, as soon as the paperwork came in saying ordering him released, it was processed, the release process began, and the inmate would be released. And frequently it would happen that another piece of paperwork would come in an hour later from another court saying, oh, hold him on this other case, he's got an appearance tomorrow morning, which would then put the county in a situation of having to rearrest the individual. I don't know if that makes any sense. But that was the situation in this case. But nonetheless, they still had to process all the paperwork. It just started hours earlier than it did at the time of Bras. That's the difference. Let me ask you a question. Opposing counsel cited to a Vanki case. Was that cited in the briefs, and are you familiar with it? I am very familiar with it. I was actually counsel record for the county in that case. According to my understanding of what opposing counsel said, that now if there's a court ordered release, it takes place immediately. Okay. Well, it does take place immediately now. What has been set up in between the time of these three cases and the current situation is that the county jail has managed to modify the or actually set up the computer systems at the courthouses so that once an inmate is ordered released or authorized to be released by a judge, it can be determined at the courthouse on a computer whether there's any other outstanding warrants, warrants or holds. And if not, the inmate can then be released directly from the court. At the time of these three cases, the technology hadn't been set up so that the jails and the courts were, the computers weren't in conjunction, so all the paperwork had to be processed at the jail, which Brass recognized was reasonable. Actually, that was a mischaracterization of the Vanki case that the plaintiff's counsel indicated. Vanki never issued a preliminary injunction saying inmates have to be released directly from the courts. All Vanki said was that procedure that I referred to by which it was until that the jail waited until the end of the day to begin processing the paperwork until the last bag came in was not reasonable and that the county had to start processing the paperwork as soon as it got into the jail. It couldn't wait until the last bag came in. It still could be a 39-hour delay if there's too much paperwork? There was a heavy load on one day, possibly. But I should add that under the current system, as I indicated, the majority of inmates, with few exceptions, are released directly from the courthouses now. The problem is if you're that exception. I think that's what this case is about. The exceptions don't apply in this case because the exceptions for the courthouse releases are typically inmates who might have some kind of medical problem. Well, this is pre-that anyway, so we're talking now about a system that didn't exist and apparently technologically couldn't have existed at the time these plaintiffs were dealt with. I think you hit the nail on the head right there. This court in Brass, I read the transcript of the oral argument in Brass, and one of the issues, a rhetorical question was raised during the oral argument was that should the county, should the Constitution punish the county for not previously having the computer system set up at the courts so that inmates could be released directly from the courts? Looking at the holding of Brass, it implicitly recognized, no, it was not unreasonable for the county to not then have a computer system set up directly with the courts. In fact, at the time of the Brass decision, or at the time of the Brass argument and throughout the Brass litigation, the steps were being taken to implement the computer terminals at the courthouses so that there could be direct court releases. And in fact, even at the time of these cases, that was still in the process of being implemented. And I'm glad to say that it has been implemented since then, but I don't think it would be fair to penalize the county for not having that in effect at the time of these releases, especially in light of Brass. I notice that I'm over time. Thank you. I don't know that it's pertinent to these appeals or not, but my view of whether or not the technology existed to do this previously is different than what I think Judge Graver observed here. Technology certainly did exist. It was a question of whether or not the county wanted to use it or not. All I have to say in reply is this. In the ultimate or penultimate paragraph of the Brass decision, there are the words, as Judge Gibson pointed out, in these circumstances. The question is, what circumstances is it referring to? Factual circumstances or legal? I think it has to be referring to factual circumstances, and if it is, one of those factual circumstances in that case was the prioritization or not of when somebody got out. And I don't read Brass as saying that the entire system at the jail was okay. I read Brass as being limited at least by the claim in that particular case that Brass thinks he should have been put at the head of line. Other people get out earlier, other people get out later. The question is, in this case, does it have to be fact-specific to these plaintiffs, and does there have to be a showing made by the county after the plaintiffs have shown the length of detention and say, this is unreasonable, I should have been kept for more than an hour? Does the burden then shift to the county to show what makes it reasonable? I don't think that happened in this case, and I think that it's got to be done on a case-by-case basis. I don't think this Court in Brass, as a matter of law, could have decreed that in every case that comes in the future, if it's up to 26 hours or 29 hours or 39 hours, whatever the facts of the case are, that that's okay. Brass doesn't foreclose any litigation after Brass. I just don't read it that way, but I don't get to decide how it's read. It is interesting, though, that the discussion seemed to be whether to establish a 48-hour cutoff the way there's a pretrial 48-hour cutoff, and the panel ultimately said, well, we don't need to decide whether it can be more than 48 hours, because here it's less than 48 hours. But the focus was on a longer period rather than a shorter period. Well, you're referring, of course, to the McLaughlin v. County of Riverside case that set the 48-hour limit, but that was in different circumstances. But the panel in Brass just said, we're not going to go there. Right, but their focus was, can it be longer than 48? Their focus really didn't seem to be how short does it have to be. I think that's an ambiguous and unfortunate statement, I think. We're bound by it, though. We're only another three-judge panel. But it doesn't say anything. It's like a strawberry statement, a statement about nothing. They're just saying, we don't need to decide this, whether or not 48 hours is here or there. It's the line. It's dictum with respect to something. The question is, is it, as you, Judge Graber, have suggested it might be. Well, there's a limitation on what they're holding, certainly, but I can't see that it's dictum. And I think this earlier panel knew what they were doing when they wrote that opinion. Well, I can't quarrel with that opinion. The question is, you know, what does it mean? And as I say, I think you've got something to talk about in that middle sentence, but you seem to be going beyond that middle sentence. Well, I've only got 40 seconds left. Actually, you have minus 40, but the other side took some extra time. I'm sorry. That's okay. That's because it says stop. I'm going to stop. Okay. You're welcome to conclude with a sentence or two more if you'd like. Thank you. Okay. Thank you very kindly. The case just argued is submitted, and we appreciate the arguments from both counsel. And we will stand adjourned for this afternoon. All rise. The session is adjourned.
judges: Gibson , D.W. Nelson, Graber